The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Thank you. Be seated. Okay, the first argued case this morning is number 15-1696, Imre Afican. Mr. Lucci.  The board erred as a matter of law by failing to identify any credible reason why a person of ordinary skill who did not already have knowledge of the claimed inventions would have consulted the cited publications and then combined them in the proposed manner. The board's finding of obviousness lacks substantial evidence that a person of ordinary skill who did not already have the benefit of this hindsight would have combined the respective teachings of the Tuck, Too, and Low patents and would have done so in the proposed manner. The first finding by the board that lacks substantial evidence relates to the Tuck patent. Tuck is directed to a polymer-coated stem and it describes that polymer coating by reference to a list of 50 polymers and polymer classes embracing thousands of polymers. It's a very extensive disclosure. But it does disclose polyvinylidene halides, right? It does, Your Honor. And then when you add low, it's got the 1585% hexafluoropropane. These are all very closely related. It looks almost like a 102. With respect, Your Honor, I don't believe they're closely related, nor do I believe it's nearly a 102. The rejection that has been put forth by the board is one of Tuck combined with Too combined with Low. Now, in main point, one of the differences between Low and Tuck is that Low is directed to polymers for use in harsh industrial applications, not a device that's going to be placed in the human body. It does show an equivalence between the tetrafluorofanilidene and the hexafluoropropane. It does show an equivalence there. Equivalence in what respect, Your Honor? I don't believe it does show equivalence to VDF. One of the problems with Tuck is this disclosure of just VDF. Where the board erred with respect to Tuck is its conclusion that a person reading Tuck would not have been satisfied with this vast list of polymers they have, would have ventured beyond the four corners of the document, and would have consulted a document like Too. But Tuck and Too are in very similar areas, and your own patent talks about possible applications beyond stents, right? It does, Your Honor. Both Tuck and Too are related to devices which are placed in the body, but the nature of those devices is very different. Tuck is directed to a stent, which is in contact with flowing blood. Too, the main focus in Too, the central focus in Too, is on vascular grafts. And Too, very specifically, Too's invention, if you will, is a multilayered structure, and that multilayered structure is significantly different. What is directed to is vascular grafts, basically a form of a tube. The internal portion of that tube is described by Tuck as being polytetrafluoroethylene, Teflon, a very hydrophobic surface. And that hydrophobic surface is important because that's what you want in contact with flowing blood. You don't want a hydrophilic surface in contact with flowing blood. And what Too does is he builds on that, the multilayered structure. The internal portion is polytetrafluoroethylene. The next layer out is a blend of an elastomer and polytetrafluoroethylene. And then an optional third layer is an elastomer. Now, among the elastomers there, there are 13 poly- You also suggested the use of this compound on the inner part of the lumen, right? In a very limited way, Your Honor. And that's the alternate embodiment that the board and the PTO reference in their brief. They reference it incompletely. Again, what Too talks about is having polytetrafluoroethylene on the internal portion, a blend of elastomer, polytetrafluoroethylene, and an optional layer. The alternate embodiment to which you're referring has two additional layers, two additional layers, and that's important. Yes, internal to that polytetrafluoroethylene layer that I mentioned, they do talk about putting an elastomer. But importantly, they don't stop there. They talk about putting another layer internal to that that has polytetrafluoroethylene again, a barrier layer against that elastomer to make sure that the elastomer does not contact flowing blood. So even that alternate embodiment which puts the elastomer internal to the first polytetrafluoroethylene layer that I mentioned, it puts it inside of it, it's very important that they don't leave it there to contact flowing blood. They make sure that they put another barrier layer of polytetrafluoroethylene inside of it. That's a very significant portion of two in this alternative embodiment that the patent office does not mention completely in their briefing and the board didn't address completely in their decision. So one reason that the board – Can you make that point in your brief? What's that? Can you make that point in your brief? Yes, Your Honor. Where? Here. Please continue while your colleague searches for it. Yes, thank you. One reason that the board gives for someone to go beyond the disclosure of Tuck is that Tuck allegedly discloses the importance of elasticity in connection with a polymeric stent coating. Significantly, Tuck doesn't actually provide that disclosure. Tuck mentions elasticity only in connection with another layer that can be placed on top of the polymeric stent coating, what they refer to as an over layer. There's only one section in Tuck, a very limited section of two paragraphs, where they talk about elasticity only in connection with this over layer. And even there, elasticity is mentioned as being a relevant consideration but not a dispositive one. In fact, Tuck in this portion says that even inelastic polymers can be used so long as they are made porous. So Tuck does not talk about elasticity in the broader context of its primary stent coating. It talks about it only in connection with this over layer and not being a dispositive consideration. That Tuck also doesn't disclose the importance of elasticity for its primary stent coating is revealed by an internal consistency in the board's argument. As I mentioned earlier, Tuck identifies PDF as one of thousands of polymers. But if elasticity was as important to Tuck as the board alleges- But once you get the combination of Tuck and two, then you're dealing with a single polymer, right? And that single polymer is addressed in love, the ratio. Not exactly, Your Honor. The polymer that is disclosed in Tuck is VDF. We believe there's insubstantial evidence for someone to- Tuck and two. If you take the two of them together, you've got VDF HFP, right? And that's a single polymer and then you're looking- It's not as though you've got a huge genus that you're concerned with. And when you look to Lowe, you're looking for the disclosed ratio with respect to that single polymer. Is that not correct? If one gets there only by not considering the full disclosure of two- Is what I say correct or not? If one focuses on VDF HFP and two and then goes to Lowe, notwithstanding the fact that it's directed to industrial applications, one could come to the invention that way. Right, and we're dealing with a single polymer once you make the combination of Tuck and two. Having selected VDF HFP from the thousands of choices disclosed in two, that's correct. So, as I was saying, the alleged importance of elasticity in Tuck is belied by an internal inconsistency in the documents. If elasticity was as important to Tuck as the board alleges, the question that arises is, why does Tuck even mention VDF? Now, it's important to note that later on in the patent office's arguments, in connection with the Lowe reference, they acknowledge that VDF is not an elastic polymer. It's a crystalline inelastic polymer. So if elasticity is so important to Tuck, and that's the basis that the patent office has to go beyond the disclosure of Tuck, why did they list the VDF? The answer is that elasticity isn't as important to Tuck, isn't as central to Tuck as the board alleges. The board merely provided that reason in support of a combination of references that it had already sanctioned. Now, again, we believe that because of this lack of focus on elasticity, the lack of substantial evidence on that issue, someone wouldn't have gone beyond Tuck. They would have taken a look at Tuck, thousands of choices there, and would have made some selection from within. But even if one did go to two, for some reason, there's insubstantial evidence that someone would have combined Tuck and two in a way that would have produced the claimed invention. Two, as I mentioned, is directed to this tubular structure where you have one layer upon another, PTFE and then elastomer being optional on the outside of it. The layers are arranged in a particular way so that the hydrophobic, blood-compatible PTFE layers on the inside in contact with flowing blood and the hydrophilic, tissue-compatible elastomer layer is on the outside. The reason for this arrangement of the respective layers is provided by two's disclosure that it's not desired to have the elastomer come in contact with flowing blood. On the basis of this teaching, Dr. Mikos, one of the declarants, confirmed that one of ordinary skill would not have expected that a VDF-HFP elastomer would be suitable for a blood contacting type of scenario. The board gives two reasons for not being persuaded by this disclosure in two and by Dr. Mikos' testimony. But neither of these reasons is supported by substantial evidence. First, the board noted that notwithstanding two's central focus on vascular grass, two mentions in passing that its multilayered structure can be used on other types of products gives a number of them, including valve leaflets. The board noted that valve leaflets are in contact with flowing blood and hypothesized that having an elastomer layer of two in contact with blood must not really have been that undesirable if it could be used on a valve leaflet. But there's no evidentiary support for this. There's no evidentiary support for the hypothesis that it's okay to put the elastomer in contact with blood. In fact, the evidence is directly to the contrary. And that's because, as I mentioned earlier, two specifically states that that outer layer of elastomer is optional. Now, think about that. There's two points in two. Contact between the elastomer and the blood is undesirable, and the elastomer is optional. The only reasonable inference that can be drawn from that is that in the environment of flowing blood, such as you find in valve leaflets, an elastomer layer, the optional elastomer layer, should simply not be used. The second reason that the board gave for not crediting two's statement that elastomer should not be in contact with flowing blood is that two discloses this alternative embodiment. And as I mentioned... Do you have a page for me? Page 4. Where you made the argument that in the alternative embodiment there's another inner layer? Sure. Your Honor, the argument was made in our reply brief. The PTO's brief to which we responded was at page 33, the second full paragraph. The portion of our brief where we responded to that and discussed the alternative embodiment is at page 11, the first full paragraph. And where do you make reference to this additional inner layer? The middle of page 11, Your Honor, where we say the director tries a different tact, arguing that two elsewhere discloses an inner layer comprising a blend of PTE and elastomer. I don't see it, but go ahead. Okay. Let's hear from the other side. We'll save your rebuttal time, and if you need to find more pages to respond to Judge Dyke's question, that would be helpful. Yes, thank you, Your Honor. Okay. Ms. Rasheed. May it please the Court. To pass to using 8515-BDF-HFP as a drug-containing polymer coating for a balloon expandable stent could not have been more straightforward here. Let me ask you a preliminary question. This was an inter-parties proceeding before the Board. Isn't that right? It was an inter-parties re-examination proceeding before the Board, yes. Okay. And so the petitioners, the prevailing parties, have declined to defend the decision in their favor. Isn't that right? I believe that's correct. They have settled and dropped out of the case. Where is the case of controversy in this situation? The office was not a party. You were the judge, and so this is a matter of the judge coming forward to say, I got it right, even though the prevailing party doesn't want to defend it? Your Honor, we're here really just to help the Court. We thought it would be beneficial for the Court to have both sides represented. We think the Board's decision is correct, and we're here to answer any questions. The office didn't request authorization from the Court to help us? We intervened in this case initially to defend the procedural issues in this case. Well, I think it's curious, because we know by the statute that if the petitioner withdraws, either during the preliminary stage or before the decision, the case is dismissed. And so why is this any different? The petitioners who withdraw. Is it your view that we have an appeal? We have an appeal from someone who lost in the office, and whether you're here or not, we have a case of controversy? That's correct, Your Honor. Where is the controversy? The controversy is that we have Ethicon here challenging the Board's decision. But the Board is not a party to the controversy, right? The office is not a party to the controversy. Why is there a continuing controversy to fill the courts? Doesn't this happen frequently in the Supreme Court, where only one party chooses to appear before the Supreme Court, and the Supreme Court appoints an amicus to defend the other side and resolves the case, even though one party doesn't take the decision? Do you know of such a case? I think that when the complainant withdraws, that ends the case. We have a problem here as well with the statute, which provides for withdrawal at varying stages. I think we should think about that, and I invite the office to tell us what you think. This, of course, isn't the only case in which the office has come in to act when one party has withdrawn. Is this the equivalent of an ex-party appeal? I believe it is, Your Honor. Inter-parties re-examination is very much like an ex-party re-examination. That's what the inter-parties re-examination statute says. It is governed like an ex-party case. In ex-party cases, the PTO appears to defend the board's decision, and that's why we're here. We see it in the re-examination. We see it in the inter-parties review. But those are two very different proceedings, Your Honor. I agree, because the other side has declined to defend, and so it becomes ex-party. I don't think that's right. Inter-parties re-examination is very much like an ex-party re-examination, which is governed just like any other examination is governed, and this is not a case where you have – it's not like an inter-parties review type of action where there are two parties dueling it out. It's very much different than that. Why don't you defend the merits? Yes, please proceed with the merits, but I'd be interested in the office's position because it's not limited to re-examination. We can provide – I suppose we can provide an opinion, but that's not an issue in this case. With regards to the merits of this case, we believe that this is a textbook 103 obviousness determination. Tuck teaches drug-eluting stents with a polymer coating containing a drug. Tuck specifies many requirements for its polymer coating. It recognizes that the polymer plays two roles. One role is to serve as a barrier between the stent and the tissue, and the second role is for it to serve as a platform for drug delivery to the surrounding area. Its role in serving as a barrier, because it serves as a barrier, it raises issues of biocompatibility. So Tuck requires the polymer to be biocompatible so that it doesn't injure the surrounding tissue. It specifically says it must be biocompatible and it must minimize irritation when it's implanted. It also talks about low chronic tissue response from the polymer. It also says that the polymer has to have some level of biological stability. In addition to biocompatibility properties, Tuck also says that the polymer has to exhibit some mechanical properties, specifically elasticity. It must be resilient and flexible to withstand the force of the scaffolding when it expands. And it must provide a predictable platform to allow for drug delivery, either through pores or through erosion, depending on what type of polymer that you choose. Tuck does provide a library of polymers, but all those polymers meet these requirements of biocompatibility and elasticity. But what is there to lead to this particular polymer, to select this particular product from the vast and undifferentiated list? Tuck describes the properties that are required for its drug-eluting stent. It describes the biocompatibility properties and it describes the mechanical properties. Based on those properties, a person of skill in the art would recognize that 2's VDF-HFP has those properties, because that's what 2 teaches. 2 teaches that VDF-HFP is biocompatible with the surrounding tissue. It teaches that it has excellent elasticity, strength, and that it is applicable across a broad application of medical devices. It also says that it can serve as a platform for drug delivery. Based on those teachings, that is what would lead a person of skill in the art to VDF-HFP, based on the combination of Tuck and 2. Does Lowe discuss the 15-85% hexa- and tetra-copolymer? Yes, it does. Lowe specifically teaches that VDF-85... The only thing it doesn't discuss is use in a stent. It doesn't specifically discuss stents, but it does say that it has a wide variety of commercial use. Lowe says that. But related materials have been in use in stents. That's right. Tuck and 2. That's right. Tuck and 2 show that related materials have been used in stents. What Lowe shows you is that VDF-HFP is a well-known polymer with well-known characteristics, well-known properties, and that it is readily available. But how is it known that it has this property of releasing the drug as well as the elasticity? That comes from 2. 2 tells you that VDF-HFP... But that comes from hindsight. I'm not sure it comes from hindsight, Your Honor, because the reference itself teaches you those biocompatibility and elasticity properties of VDF-HFP when it comes to serving as a platform for drug release. But I don't think that's hindsight. No, the elasticity, I agree. The problem is the combination of properties. Combination of properties. They have the same properties. The elasticity, but not the release of the drug. But that is related. What Tuck teaches us is that it is the resilient matrix of the drug and the polymer that controls drug elution. Tuck tells us that. So from that, you know that elasticity is relevant to drug delivery, to the time that it takes for a drug to either elute from the polymer or to erode from the polymer. There is a teaching that connects elasticity to drug delivery in Tuck. Lowe also teaches that 8515 has desirable characteristics such as that optimal balance of elasticity and strength. So it only makes sense for a person of skill in the art to use it because it is an off-the-shelf, readily available, commercially marketed polymer. Whether you describe this combination as a substitution of VDF or VDF-HFP for VDF or whether you say that it is the combination of known elements performing their known function without any unpredictability here, either way, either rationale supports the board's finding here of obviousness. And not only that, you also even have a specific teaching about a motivation to combine. Tuck specifically talks about the need for elasticity. Not only does it talk about it in terms of a resilient matrix, it also talks about it in the context of an overlayer made of the same polymer and explains that when that polymer in Tuck, which would be VDF, is uniform, that it can lead to cracking. And Tuck provides one solution to that problem and says, well, one thing you can do is you can make it more porous. But a person of skill in the art looking at that teaching would readily think that another solution to that problem is to also find a way to make that VDF more elastic. And two tells you exactly that when you have VDF-HFP together, that it is more, it makes VDF more elastic. I just wanted to make one point about two that the other side raised that there's a teaching away in two from using VDF-HFP, the elastomer, in the luminal layer. I don't think that's right. I think that is a mischaracterization of that teaching in two. It is a misunderstanding of column eight where it talks about an additional process step, an additional elastomer. And it also not only does it misunderstand column eight, but it also goes on and ignores the other embodiment, which clearly says that the elastomer can be in the luminal layer and can be in contact with blood. There's a clear teaching in two that you can have various degrees of hydrophobicity and hydrophilicity throughout this asymmetric layers. So the alternative embodiment in two doesn't teach an additional layer to prevent blood contact. The alternative embodiment in two is not saying it's like an optional elastomer layer. It's saying that you can have the elastomer in the luminal layer. And it doesn't show another layer on top of the elastomer layer. Not that I know of. Not that I'm aware of. And I don't remember the reason. I don't see that they argued that. And I don't think they argued that before this court. One final point on whether or not a person with a skill in the art would turn to Lowe. It only makes sense to turn to Lowe because the picture that Ethicon is trying to paint is that this biomaterial scientist is working in isolation and not talking to anyone about other references or collaborating with other scientists. The nature of drug delivery devices, the nature of implantable devices, is that it's a collaborative effort between not just biomaterial scientists, but also chemists and physicians and cardiologists and other researchers in that area. And they work together. And you have all of that information available to you. And it is commonly known that industrial polymer applications eventually do lead or can be used for medical applications down the line. The fact that they were initially found in an industrial setting, that doesn't mean that they can't be used in a medical application. And that's all I have. If you have any further questions, I can address those. If not, no questions. Thank you. Thank you. Thank you. Mr. Luce. Yes, thank you. If I may address this. You don't contend that this case is moot as a result of Boston Scientific's not appearing here, do you? We haven't contended that in our briefing, Your Honor. We didn't take a position on that issue. It would be strange if you did because you're appealing your loss in the patent office. We are, Your Honor. You want to have your appeal heard, right? If our appeal is heard and decided in our favor on some procedural issue, we'd be fine with that, Your Honor. If I may, I'd like to address this idea about the alternative embodiment. It's in the record at JA 10718. It's the paragraph in column 9 beginning at line 55. It says an alternate embodiment comprises a luminal layer of PTFE and a second layer of PTFE slash elastomer and a second layer of PTFE. It states that very clearly. This combination of layers provides for better hydrophilicity due to the elastomer in the luminal layer. So they clearly say they add two things, elastomer and a second layer of PTFE. It's right there in the record. The patent office mentioned here that there was no unpredictability in any of this. This is a highly unpredictable art. There are thousands of polymers disclosed in just Tuck. All the evidence of record is that you need a unique balance of properties to have something which has the requisite properties, a balance of properties to have the requisite properties, notably releasing the drug at the appropriate rate. There's no suggestion in Lowe about anything about drug release. It talks about flexibility. It talks about use in industrial environments. The drug release feature, which is missing from Lowe, is significant. The patent office mentioned that this is a textbook, allegedly a textbook case of obviousness. The pieces are all there. It's a textbook case of hindsight. One has to place themselves in the shoes of a person of ordinary skill who didn't have the benefit of our patent. Each of us has been infected in a way with the knowledge of our patent claims, and we're seeing the references in a different light. We have to step back and put ourselves in the shoes of someone of ordinary skill and ask, if someone had Tuck in front of them and those thousands of choices, and would they have focused on VDF? Would they have focused on VDF because it's allegedly elastic? It's not elastic, but that's what the patent office has said. And would they have taken that disclosure of VDF and modified it in some way? The answer is that they wouldn't have. Pursuant to kinetic concepts, they wouldn't have gone beyond the disclosure of Tuck. The PTO also mentioned this idea that Tuck discloses VDF and 2 discloses VDF-HFP. Let's all be clear on the record. Each of those is one of thousands of polymers that are mentioned. The disclosure of Tuck and 2, where they talk about different arrangements of polymers, is exceedingly generic. They only refer to these things as being elastomers or polymers. There's no focus on VDF in Tuck. There's no focus on VDF-HFP in 2. So let's all be clear on the record. It's misleading what the patent office has said about these to suggest otherwise. The patent office also mentioned in Tuck that this importance about the properties like biocompatibility and elasticity. As I mentioned, elasticity is not a focus of Tuck. And, in fact, that it isn't a focus of Tuck is indicated by this internal consistency in listing in Tuck. VDF, which, according to the patent office elsewhere in its arguments, is an inelastic polymer. So, for the reasons stated, we believe that the decision of the board should be reversed. Any other questions? Thank you. Thank you both. The case is taken into submission.